**Affirmed and Memorandum Opinion filed December 15, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-15-00644-CV

## IN THE INTEREST OF M.G., B.G., S.G., AND A.Z., CHILDREN

**On Appeal from the County Court at Law**
**Washington County, Texas**
**Trial Court Cause No. CCL-7739**

## M E M O R A N D U M    O P I N I O N

Appellants A.Z. ("Mother") and D.G. ("Father")[1] appeal the trial court's final decree terminating their parental rights, and appointing the Department of Family and Protective Services (the "Department") as sole managing conservator of M.G. ("Maria"), B.G. ("Bonnie"), S.G. ("Sara"), and A.Z. ("Alex").[2] On appeal

---

[1] D.G. is the Father of the three oldest children. The father of the youngest child did not appeal the termination of his rights.

[2] Pursuant to Texas Rule of Appellate Procedure 9.8, we will use fictitious names to refer to the children.

appellants challenge the legal and factual sufficiency of the evidence to support (1) the predicate grounds under which their parental rights were terminated, and (2) that termination was in the best interest of the children. We affirm the termination of both parents' rights.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pretrial Removal Affidavit

On May 1, 2014, the Department received a report alleging the neglectful supervision of Maria, Bonnie, and Sara by their mother. For the next two months members of the Department attempted to contact Mother to no avail. In July, a Special Investigator for the Department spoke with Mother at home. Mother submitted to a drug test, which was positive for amphetamine and methamphetamine. A week later when the drug test was confirmed, Mother agreed to place the children with their paternal grandmother. At the time Mother was six months pregnant with Alex, and admitted using methamphetamine. The Department helped Mother enter a drug treatment program, but Mother voluntarily discharged prior to completing treatment.

On August 19, 2014, the Department filed an original petition for the termination of both parents' rights to Maria, Bonnie, and Sara. The Department alleged that termination of Mother's rights was warranted because Mother:

> knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, pursuant to § 161.001(1)(D), Texas Family Code;

> engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, pursuant to § 161.001(1)(E), Texas Family Code;

> constructively abandoned the children who have been in the

2

permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the children to the mother; (2) the mother has not regularly visited or maintained significant contact with the children; and (3) the mother has demonstrated an inability to provide the children with a safe environment, pursuant to § 161.001(1)(N), Texas Family Code;

failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children, pursuant to § 161.001(1)(O), Texas Family Code;

used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the children, and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance, pursuant to § 16l.001(1)(P), Texas Family Code.

The Department alleged that termination of the Father's rights was warranted because the Father:

knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, pursuant to § 16l.001(1)(D), Texas Family Code;

engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, pursuant to § 16l.001(1)(E), Texas Family Code;

constructively abandoned the children who have been in the permanent or temporary managing conservatorship or the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the children to the father. (2) the

3

father has not regularly visited or maintained significant contact with the children; and (3) the father has demonstrated an inability to provide the children with a safe environment, pursuant to § 161.001(1)(N), Texas Family Code;

failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children, pursuant to § 161.001(1)(0), Texas Family Code.

On October 10, 2014, Mother gave birth to Alex. Alex's hospital birth records reflect that Mother and baby both tested positive for methamphetamine at birth. When Alex was discharged after birth he was released to the Department. The Department also filed a petition seeking to terminate Mother's parental rights to Alex. The trial court ordered the two termination suits consolidated.

On November 20, 2014, Mother and Father signed Family Service Plans in which they agreed to:

- participate in supervised visits with the children;
- submit to drug and alcohol assessments and follow all recommendations;
- submit to random drug tests through the Department;
- obtain or maintain a safe and appropriate home;
- obtain and/or maintain legal employment or a legitimate source of income in order to meet their own needs and the needs of the children;
- refrain from engaging in criminal activity;
- actively participate in the completion of parenting classes;
- attend and actively participate in individual and family counseling;
- complete a psychological evaluation and follow the

4

recommendations that are listed; and

- demonstrate the ability to meet the children's basic needs and ensure the safety of the children.

**B. Trial Testimony**

Father was incarcerated at the time of trial for assaulting Mother. Father was originally put on probation for the assault, which occurred in 2013. His probation was revoked because he was arrested for committing another offense. Father was also on probation in another county for possession of a controlled substance.

When asked where he would live and how he would care for the children if they were able to live with him after his release from jail, Father gave equivocal answers. He first stated that he would move back to Houston and return to his landscaping job. Then, he answered that he would move to Abilene and work as an electrician. When asked where the children would be while Father was working, Father said his father and grandmother lived in Abilene and would help him.

While the children were placed with the paternal grandmother Father visited them every other weekend. Father admitted he did not comply with the portions of the Family Service Plan that required him to maintain employment, resolve pending offenses, attend counseling, and obtain a psychological evaluation. Father denied needing treatment for drug addiction. He also does not believe Mother needs treatment for drug addiction. Father said he did not use controlled substances in front of the children. When he disciplined the children, Father would "put them in a corner," and spanked them "maybe once." Father denied physically harming the children or leaving them in someone's care where they would be physically harmed. Father expressed concern that when the children were with Mother they were not regularly attending school. Father asked that all four children be placed with him, but he would not separate them from Mother unless he knew she was

using drugs.

Mother testified at trial that she was six months pregnant with her fifth child. While she was pregnant with Alex, Mother went to a drug treatment facility at the direction of the Department. Mother remained in the facility for approximately two weeks, but left prior to completion of the 90-day program due to a disagreement with the program. Mother claimed she did not use illegal drugs after discharging from treatment in September 2014. She did not have an explanation for hers and Alex's positive drug tests at the time of Alex's birth in October 2014.

Mother is not employed due to her high-risk pregnancy, but plans to live with her mother if the children are returned to her. Mother testified that her mother and stepfather could watch the children because they work different shifts. Since they work different shifts, however, they would be watching the children at the time they would ordinarily be sleeping between shifts. Mother did not see this as an impediment because the oldest child is almost ten years old,[3] and knew not to turn on the stove and how to use the microwave. Mother believed that the children would be properly supervised while her mother and stepfather were asleep because her stepfather does not sleep soundly.

With regard to the tasks in the Family Service Plan, Mother testified she has completed a parenting class and attended all visitations with her children. At the time of trial Mother had completed a psychological evaluation and enrolled in an outpatient drug treatment program, but had not attended the program. She had also not attended any individual or family counseling sessions. Mother testified her home was safe and stable and that she was financially supported by her boyfriend, the father of her fifth child.

---

[3] The oldest child was eight years old at the time of trial.

When Father assaulted Mother in 2013, the police report showed that Mother had put down the youngest child to sleep and Father woke up, "got mad and hit [Mother] with his shoe." Mother threw the shoe back, continued to fight with Father, and eventually went outside and broke her car window. During the assault the two oldest children were outside playing.

Veronica Ford, the Department investigator testified that the allegations in the first intake of the case on May 1, 2014, were that Mother was using methamphetamine while caring for her children, and was pregnant with her fourth child at that time. Ford attempted seven or eight times to make contact with Mother, but was unable to contact her until another investigator located Mother on July 11, 2014. When Ford eventually made contact with Mother, Ford proposed a safety plan that entailed the children being placed in the paternal grandmother's home with Mother having no unsupervised contact and no overnight visits. Mother agreed to the plan.

Following the initial placement of the children a family team meeting was held in which Mother admitted using methamphetamine once. Father admitted using marijuana. Plans were made for Mother to enter an inpatient drug treatment program, which Mother attended for only two weeks. Ford testified that the Department took custody of Alex at the time of his birth because both Mother and baby tested positive for methamphetamine.

Aleida Jarvis was the special investigator who located Mother. When she located Mother and approached her at home, the three oldest children were outside playing and Mother was pregnant with Alex. Mother voluntarily took an instant oral drug test, which was positive for methamphetamine. Because Mother was adamant that she was not using drugs, a second "confirmed" test was administered, which also yielded a positive result.

Samantha Miller was the Department caseworker. The three older children, Maria, Bonnie, and Sara, were living with Father's mother until Alex was born. When the Department learned that Alex tested positive for methamphetamine at birth they placed all four children in foster care. The three older children were removed from the grandmother's home because the grandmother was permitting frequent unsupervised parental visits, and was not ensuring the children's attendance at school. There were also not enough beds at the grandmother's house for the children to sleep. The Department offered to provide additional beds, but the grandmother rejected the offer. One of the children was sleeping in the same bed with the grandmother and the grandmother's boyfriend.

When the children were in foster care, both parents visited the children with supervision. At one visit the parents began to argue with each other. At that time Miller stopped the visit and requested that each parent submit to a drug test; neither parent appeared for a drug test. After the parents separated Father asked for separate visitation. Miller testified that both parents moved frequently and did not maintain a stable home. In a ten-to-eleven-month period, the Department had five different addresses for Mother in addition to multiple phone numbers. The Department also had two or three different phone numbers for Father; Father did not give his address to the Department. Mother submitted to a psychological evaluation in which it was recommended that she seek counseling regarding her depression and "further explore her bipolar issues." Mother did not obtain counseling. Both parents failed to comply with Miller's frequent requests for drug testing.

At the time of trial all four children were placed in the same foster home and had been there for approximately two months. Prior to that placement the children were split up between two foster homes. Between the foster placements two of the

children were placed with their maternal grandmother. They had to be removed from her home because the grandmother permitted unsupervised visits and was transporting the children without car seats in the cargo area of a hatchback car. The two older children asked not to return to their grandmother's house. Since being placed in foster care their schoolwork has improved.

Miller testified that neither parent has made any lifestyle changes in an effort to obtain the return of their children. When Father visited the children he acted appropriately and attempted to parent the children. His visits were infrequent because he was incarcerated at times. During Miller's time as caseworker, Mother tested positive for drugs ten times. The Department introduced evidence of several positive drug tests including a hair follicle test that showed 5,012 mg of methamphetamine. Miller testified that this is a large amount, which indicates a high dose recently taken or a consistently high dose.

Miller concluded that neither parent maintained stable housing, learned from parenting classes, received adequate counseling, maintained a stable income, or maintained a home free from domestic violence or illegal drugs.

Mary Ann Marshall, the principal at Willow Creek Elementary School, testified that Maria was enrolled in school between April 3, 2014, and May 6, 2014, but only attended nine of the 22 school days during that period. During a later period of enrollment, Maria had three absences in a 25-day period. The Harris County District Attorney issued a truancy letter because the school reports three unexcused absences within a 28-day period. Bonnie also attended the school and had a similar attendance record. Neither child received a grade during that time period because they were not in school enough days.

Gail Sodheimer, registrar at Alton Elementary School, testified that from August 26, 2013 through March 31, 2014, the two oldest girls had 13 unexcused

absences and 13 excused absences each.

Justin Jones, a Washington County probation officer, testified that Father's probation was revoked because Father admitted using methamphetamine. James Cravey, a Grimes County probation officer, testified that Father was serving a three-year-deferred-adjudication probation for possession of a controlled substance in Grimes County. Father violated this probation by admitting to methamphetamine use. At the time of trial a motion to adjudicate was pending in Grimes County, and the recommendation was to send Father to a Substance Abuse Felony Punishment Facility.

A Brazos County probation officer testified that Mother was on probation for misdemeanor theft. As a condition of probation Mother is not to have any contact with anyone who has a criminal record. The probation officer noted in her records that Mother has been socializing with an individual with a criminal record who is also using drugs.

Bonnie's kindergarten teacher testified that Bonnie did better academically and was more sociable when she was living in the foster home. When Bonnie moved back in with her grandmother she was excited to see her siblings, but began to be less talkative with the teacher, fell asleep during school, and came to school hungry.

Melissa Brode, a supervisor with the Department, testified that the reason the children were removed from the grandmother's home was because the paternal grandmother was allowing Father and Mother to have unsupervised interaction with the children in contravention of the court's orders at that time.

Maria Cadwallader, the court-appointed child advocate, testified that it is in the best interest of the children for Mother's rights to be terminated. Cadwallader

based her opinion on interactions with the children and with Mother, and Mother's lack of a stable home and ability to care for the children.

Mother testified that at one time she worked for her mother-in-law, the children's paternal grandmother. If her children are returned to her, she expects assistance from family members. Mother maintained employment prior to the birth of her first child and between the births of her first and second children. When the Department first became involved Mother voluntarily relinquished the children to the paternal grandmother so she could enter drug addiction treatment. Mother admitted using methamphetamine, but denied using drugs around her children, and denied any addiction. The Department had begun termination proceedings earlier, but that case was dismissed.

## C. Jury Charge and Verdict

The jury charge submitted grounds for termination of Mother's parental rights under Texas Family Code sections 161.001(1)(D) & (E) (endangerment), (O) (failure to comply with the service plan), and (P) using a controlled substance in a manner that endangered the children). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (P) (West 2014). The jury charge submitted grounds for termination of Father's rights to Maria, Bonnie, and Sara under Texas Family Code sections 161.001(E) (endangerment) and (O) (failure to comply with the service plan). Additionally, the jury was instructed: "[I]t also must be proven by clear and convincing evidence that termination of the parent-child relationship would be in the best interest of the children."

The charge defined "endanger" as follows:

"Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, but it is not necessary that the conduct be directed at the child or that the child

actually suffer injury. Rather, "endanger" means to expose to loss or injury; to place in jeopardy or danger. The endangerment to the child's physical or emotional well-being must be a direct result of the parent's conduct. The conduct may simply jeopardize the child's physical or emotional well-being. The course of conduct must be voluntary, deliberate and conscious and includes both the parent's action and the parent's omissions or failure to act.

Based on these instructions, the jury was asked whether the parent-child relationship between Mother and each of the four children should be terminated. The jury answered, "yes." The jury was also asked whether the parent-child relationship between Father and the three oldest children should be terminated. The jury answered, "yes."

The trial court signed a decree of termination finding that Mother's parental rights should be terminated based on the predicate findings under Family Code sections 161.001(1)(D), (E), (O), and (P), and that termination of Mother's rights was in the best interest of the children. The trial court further found that Father's parental rights should be terminated based on the predicate findings under Family Code sections 161.001(1)(E) and (O), and that termination of Father's rights was in the best interest of the children.

## II.    ANALYSIS

### A. Predicate Termination Grounds

In Mother's second issue and Father's first issue, the parents argue the evidence was legally and factually insufficient to support the jury's finding under section 161.001(1)(E) of the Texas Family Code. Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Family Code; and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 336. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

In reviewing the factual sufficiency of the evidence, we consider and weigh

all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). In this context, endanger means "to expose to loss or injury; to jeopardize." *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (quoting *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam)). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477.

Termination under subsection 161.001(1)(E) must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent. *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re T.N.*, 180 S.W.3d at 383; *see also In re J.O.A.*, 283 S.W.3d at 336 (holding that endangering conduct is not limited to

14

actions directed toward the child). Danger to the child's well-being may be inferred from parental misconduct alone, and courts may look at parental conduct both before and after the child's birth. *Id.* ("[T]he endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage."). The conduct need not occur in the child's presence, and it may occur "both before and after the child has been removed by the Department." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Mother argues that the Department presented almost no evidence that her conduct endangered the children beyond her positive drug test results. Mother argues that her prior drug use "does nothing more than prove that she exhibited poor judgment." The record reflects that at the time of Alex's birth both Alex and Mother testified positive for methamphetamine. Mother denied using methamphetamine while pregnant with Alex. When asked at trial how she could have tested positive at Alex's birth, Mother replied, "I'm not a scientist, so I don't know. You'd have to ask the hospital." Mother admitted using methamphetamine, but initially claimed she did not use drugs around her children. This testimony directly contradicts evidence of the first positive drug test taken while Mother was home with the three oldest children and pregnant with Alex. Mother denied having a "problem" with drugs or a craving for methamphetamine. Mother admitted to an arrest while the termination case was pending. When asked what effect methamphetamine had on Mother, she answered:

> I stayed awake. I worked, cleaned a lot faster. Just — I really — I didn't really feel anything to where I just fell asleep and got unconscience [sic] and didn't feel — you know, take care of my kids. But really, I wasn't around my kids when I was on drugs. Sorry. I would leave them with my mom. But it was just a shame to be around my children if I was on drugs.

The record demonstrates that Mother had been dealing with a methamphetamine addiction and continued to struggle with it during the pendency of the case. Following the removal of her children Mother failed multiple drug tests and continued to use methamphetamine prior to Alex's birth and was using methamphetamine at the time of trial during the pregnancy with her fifth child. Evidence of Mother's continued drug use supports an inference of continued parental misconduct that is likely to subject the children to lives of uncertainty and instability. *See A.S. v. Texas Dept. of Family and Protective Services*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.) ("Endangerment of a child's well-being may be inferred from parental misconduct, including conduct that subjects the child to a life of uncertainty and instability."); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) ("The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent.").

Father argues that the evidence is legally and factually insufficient to support the finding of endangerment as to him because he did not use drugs around the children and did not knowingly place them with someone who uses drugs. Father also argues that although he assaulted Mother he denied doing so in the presence of the children. Father admitted that he was incarcerated at the time of trial for assaulting Mother. Father plead guilty to the assault and was placed on probation. Father's probation was revoked because he admitted using methamphetamine. Father also was serving a deferred-adjudication probation in another county for possession of a controlled substance. At the time of trial a motion to adjudicate was pending on that charge because appellant violated his probation by using methamphetamine.

Father argues this "paltry evidence falls well below what is required to allow

16

a reasonable factfinder to form a firm conviction that [Father] endangered or knowingly placed the children with persons who engaged in conduct that endangered." We disagree. Illegal drug use may support termination under subsection 161.001(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617. This court has also held that a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. *In re A.H.A.*, No. 14-12-00022-CV; 2012 WL 1474414 (Tex. App.—Houston [14th Dist.] Apr. 26, 2012, no pet.) (mem. op.). In this case Father was imprisoned at the time of trial and faced the possibility of imprisonment or confinement in a drug treatment facility in the future due to his violation of probation.

In addition to the parents' use of illegal drugs, the evidence supports a finding that the parents subjected the children to endangerment by subjecting them to a violent environment. A parent's abusive or violent conduct can produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *See id.* (considering domestic violence, even when the child was not the intended victim). Therefore, the jury could have considered the fact that Father was incarcerated due to an admitted assault of Mother. *See Walker*, 312 S.W.3d at 617.

Reviewing the evidence under the appropriate standards, we conclude that the jury could have formed a firm belief or conviction that termination of the parents' rights is warranted under section 161.001(1)(E). Because there is legally

and factually sufficient evidence of endangerment, we need not address the parents' arguments that the evidence is insufficient to support the trial court's findings under sections 161.001(1)(D), (O), and (P). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We overrule Mother's second issue and Father's first issue.

### B.    Best Interest of the Children

In Mother's sixth issue and Father's second issue, the parents challenge the legal and factual sufficiency of the evidence to support the jury's finding that termination is in the best interest of the children.

A strong presumption exists that the best interest of the children are served by keeping the children with their natural parent, and the burden is on the Department to rebut that presumption. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Evidence supporting termination under section 161.001(1)(E) supports a finding that termination is in the best interest of the children. *See In re C.H.,* 89 S.W.3d at 28. ("While it is true that proof of acts or omissions under section 161.001(1) does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both issues.").

The factors the trier of fact may use to determine the best interest of the child include: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v.*

*Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see also* Tex. Fam. Code Ann. § 263.307(b) (West 2014) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

There is a strong presumption that the best interest of a child is served by keeping the child with his or her natural parent. *In re D.R.A.*, 374 S.W.3d at 533. Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

Appellants contend that the presumption in their favor is not rebutted because the children loved their parents and were happy to see them, their basic needs for food, clothing, and shelter were met, there was no evidence of danger to the children other than Father's assault of Mother, and that appellants had not committed any acts reflective of improper parenting.

### 1. Needs of and Danger to the Children

With regard to the present and future emotional and physical needs of the children and the present and future emotional and physical danger to the children, both parents tested positive for drugs while the termination case was pending. The parents continued to test positive during the pendency of the termination case and continued to deny any addiction and failed to seek treatment. Although the parents denied drug use in the presence of the children, evidence at trial showed positive drug tests when the Mother was with the children.

Neither parent maintained a stable home, nor did the children's grandparents maintain a stable environment in which the children could thrive. The children were removed because of Mother's drug use and the allegation of domestic violence. The Father was incarcerated at the time of trial for the assault of Mother. A parent's drug use supports a finding that termination is in the best interest of the

19

child. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.).

## 2. Stability and Compliance with Services

In determining the best interest of the children in proceedings for termination of parental rights, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the children. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013).

In this case, neither parent completed the tasks contained in the Family Service Plans. Despite positive drug tests for methamphetamine, Mother continued to deny drug use. Father, having been convicted of assault, was incarcerated at the time of trial. As stated earlier, neither had a stable home or provided proof of employment. Mother had several different addresses and phone numbers while the termination case was pending. Father maintained several different phone numbers, and did not provide an address to the Department.

The parents' failure to comply with court-ordered tasks, drug use during the termination proceedings, and failure to provide a safe and stable environment support the trial court's finding that termination is in the best interest of the children.

## 3.     Child's Desires and Proposed Placement

The children were under the age of eight at the time of trial. Although there is evidence that the older children did not want to live with their grandmother, there is no evidence that the older children expressed their desire about living with Mother or Father. When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well cared for by them, and have spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The record

reflects that the children spent minimal time with their parents. Mother admitted leaving the children with her mother when she used drugs. Alex was removed from Mother's care at birth.

The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the child's best interest. *See In re J.N.R.*, 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.). A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in a best interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the children is relevant to the best interest determination. *See In re C.H.*, 89 S.W.3d at 28.

In this case, the caseworker testified that the children appeared to have bonded with the foster family, but there was no evidence as to whether the foster family was considered as a permanent home for the children. Evidence about placement plans and adoption are relevant to best interest. "However, the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located." *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). The record reflects that family members were not an option for permanent placement.

### 4. Parenting Abilities and Family Support

The record contains evidence that both grandmothers cared for the children at different times. The record also reflects that the grandmothers did not maintain consistent school attendance for the children, and did not transport the children with proper safety seats. Neither the paternal or maternal grandparents were

considered for placement of the children. The record reflects that Father could not care for the children from prison. Further, when asked his plans after release, Father was unsure whether he would continue to live in the Houston area or would move to Abilene. Mother intended to rely on the support of her family and the financial support of her current boyfriend. The lack of reliable family support supports the best interest finding.

The record contains evidence supporting the best interest finding based on the parents' drug use, lack of stable employment, lack of a stable home, and failure to comply with court-ordered services. *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (considering the parent's drug use, inability to provide a stable home, and failure to comply with a family service plan in holding the evidence supported the best interest finding).

Based on the evidence presented, the jury could have reasonably formed a firm belief or conviction that terminating the parents' rights was in the children's best interest so that they could promptly achieve permanency through adoption by a foster family. *See In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Applying the applicable *Holley* factors to the evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination of the parents' rights was in the best interest of the children. We overrule Mother's sixth issue and Father's second issue.

We affirm the trial court's judgment.


/s/    Marc W. Brown
        Justice

Panel consists of Justices Jamison, Donovan, and Brown.

22